UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DAVID P. WIELEPSKI,

        Plaintiff,

        vs.

CITY OF WEST ALLIS, STEVEN R.
KUHNMUENCH, CLINT CORWIN, and
UNKNOWN UNNAMED EMPLOYEES OF
THE CITY OF WEST ALLIS,

        Defendants.

Case No. 17-CV-01004

---

### DEFENDANTS' MEMORANDUM IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

---

        Defendants City of West Allis, Steven R. Kuhnmuench and Clint Corwin, by their attorneys, Gunta Law Offices, S.C., submit the following Memorandum in Support of their Motion for Summary Judgment.

### INTRODUCTION

        This case arises out of a traffic stop and arrest of the Plaintiff, David Wielepski, who was a passenger in a vehicle driven by his friend, in the early morning hours of July 23, 2011, by City of West Allis Police Officers Sgt. Clint Corwin and Officer Steven Kuhnmuench. Defendant Sgt. Corwin stopped the vehicle after pursuing it throughout various West Allis streets while it exceeded speed limits, ignored stop signs and appeared to be evading the Sergeant. After the vehicle was stopped, the driver and Wielepski exited the vehicle contrary to police orders, Wielepski shouted

1

profanities at the officers, refused to follow commands, and appeared extremely intoxicated. Wielepski was tased twice, struck once with a flashlight and taken to the ground, where he was handcuffed.

Wielepski was taken to a medical facility for treatment for injuries to his face presumably caused when he was taken to the ground. While at the hospital he was verbally assaultive toward hospital personnel and Officer Kuhnmuench. He threatened them and their relatives with sexual assault and physical harm.

After receiving treatment, Wielepski was taken to the West Allis Police Department where he was booked and jailed until he posted bail the following morning. Wielepski was charged with and pled guilty to disorderly conduct.

Wielepski has little to no memory of what occurred that evening, as shown by his deposition testimony taken in this case.

Wielepski alleges that Sgt. Corwin and Officer Kuhnmuench used excessive force during his arrest. He also alleges that during the course of his arrest and detention at the West Allis Police Department, his cash in the amount of $2,800.00 disappeared, due to the actions or inactions of the Defendants.

Wielepski alleges claims against the City of West Allis for failure to train the officers in the proper use of force, and for having a policy or procedure resulting in the loss of his money and in the use of excessive force during his arrest.

The Defendants now move for summary judgment seeking dismissal of Plaintiff's claims. Sgt. Corwin stopped the speeding vehicle which was trying to evade him, and was confronted by a belligerent and uncooperative Wielepski, a large man who appeared to be intoxicated. The force used

2

by Sgt. Corwin and Officer Kuhnmuench during the brief encounter was not excessive given Wielepski's size, behavior, the location of the vehicle, and his refusal to follow orders.

Wielepski's claim relative to the allegedly missing money must be dismissed because he has admitted under oath very recently that he has no proof or memory to support the claim.

The claims against the City of West Allis also must be dismissed because the evidence does not support them.

All facts supporting this motion are contained in Defendant's Proposed Findings of Fact, the Affidavits of Sgt. Corwin, Officer Kuhnmuench, West Allis Deputy Chief Fletcher with exhibits, and the Affidavit of Ann C. Wirth with exhibit, all of which are filed herewith.

## DISCUSSION

### Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party has the initial burden to demonstrate that it is entitled to judgment as a matter of law - - that no reasonable jury could reach a verdict in favor of the non-moving party. Celotex, supra, 477 U.S. at 323; Matsushita Electronics, Co., Ltd., v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") In making its determination, the court must view the record in the light most favorable to the non-moving party, but "only if there is a 'genuine' dispute as to those facts." Matsushita, 475 U.S. at 587. The mere existence of some alleged factual dispute will not defeat summary judgment. The

3

requirement is there be no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).

> **I. The Force Used By the Officers Was Not Excessive Given The Circumstances Surrounding The Stop and Detention.**

Wielepski alleges that the officers used excessive force during his arrest. (Complaint ¶¶ 30-31) He does not challenge the validity of the arrest. Even when an officer has probable cause to arrest, the Fourth Amendment prohibits him from employing " 'greater force than [is] reasonably necessary to make the arrest.' " Gonzalez v. City of Elgin, 578 F.3d 526, 539 (7th Cir. 2009) (quoting Lester v. City of Chicago, 830 F.2d 706, 713 (7th Cir.1987)).

A claim that an officer employed excessive force in arresting a person is evaluated under the Fourth Amendment's objective-reasonableness standard. Scott v. Harris, 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); Brosseau v. Haugen, 543 U.S. 194, 197, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam); Graham v. Connor, 490 U.S. 386, 388, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Tennessee v. Garner, 471 U.S. at 7–12, 105 S.Ct. 1694. The reasonableness standard is incapable "of precise definition or mechanical application." Graham, 490 U.S. at 396, 109 S.Ct. 1865 (quoting Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). It requires courts to " 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " Scott, 550 U.S. at 383, 127 S.Ct. 1769 (brackets omitted) (quoting United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)).

In judging the reasonableness of any particular use of force, courts consider factors such as the severity of the crime, whether the arrestee poses an immediate threat to the safety of the officers

4

or others, and whether he or she is actively resisting arrest or attempting to flee and evade arrest. Graham, 490 U.S. at 396, 109 S.Ct. 1865; Abdullahi v. City of Madison, 423 F.3d 763, 768 (7th Cir. 2005). The reasonableness of the force used depends on the totality of the facts and circumstances known to the officer at the time the force is applied. Garner, 471 U.S. at 8–9, 105 S.Ct. 1694; Phillips v. Cmty. Ins. Corp., 678 F.3d 513, 519 (7th Cir. 2012). It is an objective inquiry, the dispositive question being " 'whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner,' " Padula v. Leimbach, 656 F.3d 595, 602 (7th Cir. 2011) (quoting McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010)), irrespective of the officer's underlying intent or motivation. See Graham, 490 U.S. at 397, 109 S.Ct. 1865; Bell v. Irwin, 321 F.3d 637, 640 (7th Cir. 2003). In answering this question, courts remain cognizant of "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397, 109 S.Ct. 1865. As a result, courts "give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." Baird v. Renbarger, 576 F.3d 340, 344 (7th Cir. 2009).

The facts and circumstances that confronted Sgt. Corwin and Officer Kuhnmuench during the early morning hours of July 23, 2011, show they acted in objectively reasonable manners, given the apparent attempt by the vehicle driver to evade the officer, the location where the vehicle stopped, Wielepski's uncooperative and belligerent behavior, his size and apparent level of intoxication, and his movements toward the officers as they attempted to control him.

Sgt. Corwin was following a speeding car which was disregarding road signs through the

5

streets of West Allis while the roads were wet. (DPFF 11-13) It appeared to Sgt. Corwin that the vehicle was trying to evade him, and continued to exceed the speed limit, up to over 40 miles per hour over the posted speed limit. (DPFF 14-16) Even after Sgt. Corwin activated his squad's emergency lights while following the vehicle, the vehicle continued to speed, ignore traffic signs, and drive dangerously. (DPFF 18-19, 21-23) Sgt. Corwin was required to turn on his squad's spotlight and shine it in the vehicle's rear window, and also activate his squad's emergency siren, in an effort to get the vehicle to stop its dangerous forward progress. (DPFF 24) Nevertheless, the vehicle still did not stop or make any attempt to pull over. (DPFF 25)

It wasn't until the vehicle was stuck in a dead end, bordered on three sides, that the vehicle stopped, because it could go no further. (DPFF 26)

At that time, Sgt. Corwin was alone with the vehicle's two occupants, although he had radioed for help. (DPFF 27)

It was 2:23 in the morning. (DPFF 28) Sgt. Corwin saw there were two occupants in the vehicle. (DPFF 29) He exited his squad and drew his weapon and began yelling commands at the driver. (DPFF 29) The driver opened his door and made movements to exit the vehicle, even though Sgt. Corwin ordered him not to. (DPFF 32-33) As Sgt. Corwin continued to yell commands to the occupants of the vehicle, Wielepski, the passenger, began yelling "fuck you" after every command. (DPFF 34)

Sgt. Corwin believed both of the vehicle's occupants were intoxicated, based on their speech and demeanor. (DPFF 35) Sgt. Corwin was still by himself. (DPFF 36) Sgt. Corwin radioed to dispatch that the passenger was being uncooperative. (DPFF 36)

Wielepski then exited the vehicle. (DPFF 37) Wielepski was a large man, about six foot one

6

inch and 270 pounds. (DPFF 38) Sgt. Corwin yelled at him to get back inside, but he ignored the commands. Sgt. Corwin walked to the passenger side of the vehicle, yelling at Wielepski to get back inside. He refused. Wielepski was standing along the right passenger side of the vehicle. He was facing Sgt. Corwin with both his arms extended out to his sides. (DPFF 39)

Defendant Police Officer Steven Kuhnmuench arrived in response to the dispatch, and had heard Sgt. Corwin report that the vehicle had stopped and the passenger was being uncooperative. (DPFF 40) When Officer Kuhnmuench arrived, Sgt. Corwin was standing face to face with the passenger of the vehicle. (DPFF 41) Sergeant Corwin was ordering Wielepski to the ground and Wielepski was yelling, "Fuck you!" Sergeant Corwin ordered Wielepski to the ground several times and each time Wielepski responded, "No, Fuck you!" (DPFF 41)

Sgt. Corwin holstered his firearm and withdrew his Electronic Control Device, referred to as a taser. He turned his taser on and pointed the laser dot at Wielepski's chest. Sgt. Corwin again yelled at him to get back in the vehicle and he refused. Wielepski was yelling and argumentative. (DPFF 42)

After gaining no progress in ordering Mr. Wielepski to the ground, Sergeant Corwin grabbed Wielepski by the front of his shirt and attempted to direct him to the ground. (DPFF 43) Sgt. Corwin then yelled at him several times to get down on the ground and he refused. Sgt. Corwin warned him that he would tase him if he didn't listen. Wielepski continued to ignore Sgt. Corwin. (DPFF 45)

Because Wielepski was ignoring his repeated commands Sgt. Corwin approached him and grabbed onto the front of his t-shirt near the collar. He then pulled Wielepski forward in an attempt to get him down on the ground. Wielepski didn't go down, and in fact moved towards Sgt. Corwin. As Wielepski came forward Sgt. Corwin moved to the side. Wielepski then moved in front of Sgt.

7

Corwin's squad towards Officer Kuhnmuench. (DPFF 46)

Sgt. Corwin felt threatened by Wielepski's movement towards the officers. (DPFF 47)

Sgt. Corwin deployed his taser at Wielepski at close range for approximately one five second cycle. The probes from the taser struck Wielepski on the left side of his chest under his left armpit. Sgt. Corwin wasn't sure if the taser had any effect on Wielepski, as he didn't yell out nor did he fall down. He continued to move toward Officer Kuhnmuench. (DPFF 48)

Officer Kuhnmuench used his flashlight as an impact weapon, swinging it once towards Wielepski. Sgt. Corwin wasn't sure if Officer Kuhnmuench had struck Wielepski, as Wielepski showed no indication of being hit. (DPFF 49)

Officer Kuhnmuench grabbed onto Wielepski, but was having trouble controlling him. In an attempt to control Wielepski, Sgt. Corwin grabbed onto him and pulled him backwards and then down onto the ground. The right side of Wielepski's face struck the parking lot surface, causing minor abrasions and a small laceration above his right eye. (DPFF 50)

Once on the ground Wielepski continued to resist. He placed both his hands underneath his chest. Sgt. Corwin repeatedly yelled at him to "stop resisting," but he refused. Officer Kuhnmuench yelled at Wielepski several times, "Give me your hands!" Wielepski would not release his hands and kept them tucked underneath him by clinching his arms muscles. Officer Kuhnmuench delivered a knee strike to Wielepski's left upper torso and yelled, "Give me your hands!" Sgt. Corwin had to physically pull his right arm and hand out from underneath him, while Officer Kuhnmuench did the same with Wielepski's left arm and hand. (DPFF 51)

The officers were then able to handcuff him. (DPFF 52) Once the handcuffs were on, Officer Kuhnmuench safely locked them and checked them for proper fit and searched Wielepski's pockets

8

for weapons. (DPFF 53)

Wielepski continued to be argumentative and threaten officers, and yelled "fuck you," and various other profanities. On several occasions he attempted to lift his body off the ground. Sgt. Corwin held him down, while repeatedly yelling at him to "stop resisting." (DPFF 54)

Wielepski appeared to be intoxicated. He had a strong odor of intoxicants emitting from his breath, slurred speech, and red, glassy eyes. (DPFF 55)

Wielepski has very limited memory of what occurred that evening. At his deposition taken in this case in April 2018, Wielepski testified that he recalls an officer telling him to get out of the car (DPFF 75), but he does not remember an officer giving him any other commands (DPFF 76).

Wielepski remembers being in an ambulance and in a hospital on July 23, 2011, but doesn't recall any details. (DPFF 78) Wielepski does not remember anything else, until the time he woke up at the West Allis Police Department. (DPFF 77)

Wielepski remembers receiving injuries to his face and getting thrown to the ground, but doesn't remember how his face ended up bleeding. (DPFF 79) Wielepski only recalls having a band aid applied to his head as treatment for the bleeding to his face. (DPFF 80) Wielepski does not recall if he received any injuries from being struck with a flashlight. (DPFF 81)

Wielepski does not recall being knocked unconscious, as alleged in paragraph 18 of his Complaint. (DPFF 82) Wielepski cannot remember whether or not he resisted the officers during his arrest. (DPFF 83)

Wielepski cannot remember what occurred the night of his arrest and cannot dispute what the officers reported in their reports. (DPFF 74)

The force used during Wielepski's arrest were two taser applications, one hit with a

flashlight, and being taken to the ground. Wielepski's injuries included marks on his face and chest, and his legs and knees were all scratched. (DPFF 85)

Under these facts, Sgt. Corwin's use of the taser twice on Wielepski, neither time which appeared to affect him, was not an unreasonable use of force. The Seventh Circuit has held that, even though it is generally nonlethal, the use of a taser "is more than a de minimis application of force," Lewis v. Downey, 581 F.3d 467, 475 (7th Cir. 2009), but has also acknowledged that the use of a taser, like the use of pepper spray or pain-compliance techniques, generally does not constitute as much force as so-called impact weapons, such as baton launchers and beanbag projectiles, Phillips v. Cmty. Ins. Corp., 678 F.3d 513, 521 (7th Cir. 2012). The use of a taser, therefore, falls somewhere in the middle of the nonlethal-force spectrum. See Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (describing the X26 in dart mode as "an 'intermediate or medium, though not insignificant, quantum of force' " (citation omitted)).

Courts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable. See Clarett v. Roberts, 657 F.3d 664, 674–75 (7th Cir. 2011) (affirming defense verdict where defendant used taser three times on plaintiff when she blocked the doorway to her son's bedroom after several officers had entered and defendant heard a commotion in the bedroom and believed officers needed help; the second and third tasings were deployed because plaintiff was kicking and flailing and continuing assaultive behavior as defendant was arresting her); United States v. Norris, 640 F.3d 295, 303 (7th Cir. 2011) (use of taser on defendant was reasonable where defendant had "displayed an unwillingness to accede to reasonable police commands, and his actions suggested an intent to use violence to fend off further police action"); Forrest v. Prine, 620 F.3d 739, 745–46 (7th Cir. 2010) (affirming summary judgment

for officer on plaintiff's Fourteenth Amendment excessive-force claim, where plaintiff was a large man in a confined area who was intoxicated, defiant, belligerent, was clenching his fists and yelling obscenities, and had attacked another officer earlier that evening).

Sgt. Corwin used his taser twice, once after Wielepski got out of the car defying Sgt. Corwin's commands, and again when Wielepski refused to get to the ground and was moving toward the officers. Sgt. Corwin was alone during the first tasing, with both Wielepski and the vehicle's driver ignoring his commands to stay in the car. Wielepski is large, was drunk, and was repeatedly swearing at Sgt. Corwin. Given the circumstances, including the time of night, the close quarters of the parking lot, Wielepski's behavior and size, and his movement toward the officers in defiance of their orders to get to the ground, Sgt. Corwin's use of the taser was reasonable and not excessive.

The other two uses of force, the flashlight strike at the time Wielepski was moving toward the officers, and taking him to the ground after he refused to go to the ground on his own, also cannot be described as an excessive use of force under the facts facing the officers at the time. Wielepski does not even recall if he was injured by being struck by the flashlight. Wielepski refused to get to the ground on the officers' commands, but moved toward the officers, which made them feel threatened. The officers had to take him to the ground to handcuff him. The only treatment he received from being taken to the ground was application of a band aid to his face.

The force used during Wielepski's arrest was not excessive, and this claim must be dismissed.

## II. Officers Corwin and Kuehnmuench Are Entitled To Qualified Immunity.

Governmental actors performing discretionary functions are entitled to qualified immunity from suits for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted); accord Messerschmidt v. Millender, ––– U.S. ––––, 132 S.Ct. 1235, 1244, 182 L.Ed.2d 47 (2012). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). It gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.' " Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)); see also Anderson v. Creighton, 483 U.S. 635, 646, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("The general rule of qualified immunity is intended to provide government officials with the ability 'reasonably to anticipate when their conduct may give rise to liability for damages.' " (brackets and citation omitted)). To overcome the defendant's invocation of qualified immunity, the plaintiffs must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was "clearly established" at the time of the official's alleged misconduct. E.g., al-Kidd, 131 S.Ct. at 2080; Chelios v. Heavener, 520 F.3d 678, 691 (7th Cir. 2008). Though once required to determine whether a violation occurred before determining whether

12

the right was clearly established, see Saucier v. Katz, 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), courts now have discretion to grant immunity on the basis that the right was not clearly established without determining whether there was a violation in the first place, see Pearson, 555 U.S. at 227, 129 S.Ct. 808, abrogating Saucier, 533 U.S. at 200–01, 121 S.Ct. 2151.

In Abbott v. Sangamon County, 705 F.3d 706 (7th Cir. 2013), the Seventh Circuit determined that the officers were entitled to qualified immunity when using a taser in drivestun mode on an arrestee until the arrestee was subdued, because the officer's actions did not violate clearly established law. The facts of the case are not directly parallel to this case, but there are sufficient similarities in the fact upon which the court relied to find the officer enjoyed qualified immunity, to show that the officers' conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The relevant language from Abbott is as follows:

> Deputy Sweeney argues, and the district court held, that he is entitled to qualified immunity on Travis's excessive-force claim because he did not violate clearly established law. Alternatively, Sweeney contends that use of the taser under the circumstances was reasonable so there was no constitutional violation in the first place. We need not examine whether Sweeney's use of the taser on Travis was reasonable because we agree with the district court that use of the taser under these circumstances did not violate clearly established law.
>
> The facts viewed in Travis's favor appear to show that, as Sweeney was backing out of the driveway, Travis was fidgeting around in the backseat and successfully maneuvered his cuffed hands from behind his back to the front of his body. In his submissions to both the district court and this court, Travis does not dispute that Sweeney's squad car lacked a partition between the front and back seats (though Travis testified otherwise in his deposition). Travis also does not dispute that he was "going nuts" in the backseat of the car when Sweeney first encountered Cindy, though he does deny unfastening his seatbelt and reaching for the door (but how he maneuvered his cuffed hands around his body with a seatbelt on is a mystery).
>
> After finishing with Cindy, Travis continues, Sweeney opened the rear, passenger-side door and got on top of Travis, "dropped an elbow on [Travis's] throat," and began applying the taser to Travis's body in drivestun mode. And Travis

13

claims further that Sweeney pulled him from the car, threw him on the ground, gave him "the knee bomb," and tased him three more times on his back. Travis denies that he was acting wild when Sweeney came to deal with him, but he admits that he "was trying to fight with" Sweeney in the back of the police cruiser and at one point was "out powering" the deputy. Neither Travis nor Sweeney can recall the number of times the taser was applied to Travis, but they seem to agree that there were multiple applications of short duration (Travis said "little second bursts").

On appeal, Travis does not challenge Sweeney's initial use of the taser, arguing instead that Sweeney violated clearly established law in tasing him multiple times after he had been subdued by the first tasing.4 Travis claims that the subsequent taser applications were excessive because he had been subdued by the first tasing and he was already handcuffed and in custody. See, e.g., Dye v. Wargo, 253 F.3d 296, 298 (7th Cir. 2001). He marshals three pepper-spray cases from other circuits to support his position, but while those cases support the general proposition that it is excessive to use such force on a subdued suspect, the arrestees in those cases, unlike here, were actually subdued... Unlike the arrestees in these three cases, even Travis admits that he continued fighting with Sweeney after the first application of the taser, so he was not subdued. And even though he was handcuffed, he had moved his hands to the front of his body, which allowed him to overpower Sweeney at times.

Courts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable. ... Insofar as Travis continued to resist after the first tasing, Deputy Sweeney did not violate clearly established law by using the taser in drivestun mode several more times until Travis was subdued.

Abbott v. Sangamon County, at 726-727.

Under the holding of Abbott, the officers are entitled to qualified immunity for the force used during Wielepski's arrest.

### III. There Is No Evidence To Support Any of Wielepski's Claims Relating to Allegations That Defendants Stole or Lost His $2,800.00.

Wielepski alleges that Officer Kuhnmuench took $2,800 from his pants pocket when he searched him, which Sgt. Corwin witnessed. (Complaint ¶¶ 21-22) Wielepski alleges that his property was inventoried at the police department, but despite his request for return, the money was

14

not returned to him. (Complaint ¶¶ 24-26 and 28) The legal basis for this claim is deprivation of property without due process, under 42. U.S.C. § 1983. (Complaint ¶¶ 31, 37) The claim includes allegations that no City of West Allis employee prepared a property inventory of the personal property that Officer Kuhnmuench took from Wielepski. (Complaint ¶ 23) The claim also includes the allegation that the City has a custom of encouraging, condoning and permitting the deprivation of cash and other items of value from arrestees; of failing to monitor dash cams to prevent theft by officers; and of failing to institute adequate training and procedures to prevent its employees from stealing from arrestees. (Complaint ¶¶ 39-40)

Before he left the West Allis Police Department jail on July 23, 2011, Wielepski signed a document entitled "West Allis Police Department Municipal Jail Record," which listed the following items: pair of blue jeans, one wallet with card, one flip phone, and money totaling $172.68. (DPFF 90) This evidence undermines Wielepski's claim that no record was kept of items taken from him upon his arrest.

As for his claims relating to the allegation that the Defendants took and failed to return to him $2,800 that he claims to have won at the casino that evening, Wielepski testified recently in his deposition taken in this case that he has *no proof or memory to support the claim*. (DPFF 92, Wielepski Dep. p. 55) If Wielepski has no proof or memory to support the claim, the claim must be dismissed.

### IV.   Wielepski's Claims Against the City of West Allis For Failure to Train and Unconstitutional Policy and/or Custom Relative To Use Of Force During Arrests Must Be Dismissed.

A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by

15

its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. Monell v. Department of Social Services of New York, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Valentino v. Vill. of S. Chi. Heights, 575 F.3d 664, 674 (7th Cir. 2009). To demonstrate that the City of West Allis is liable for a harmful custom or practice, the plaintiff must show that City policymakers were "deliberately indifferent as to [the] known or obvious consequences." Gable v. City of Chi., 296 F.3d 531, 537 (7th Cir. 2002). In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff. Id. Therefore, in situations where rules or regulations are required to remedy a potentially dangerous practice, the City's failure to make a policy is also actionable. See Sims v. Mulcahy, 902 F.2d 524, 543 (7th Cir. 1990) (quoting Jones v. City of Chi., 787 F.2d 200, 204–05 (7th Cir.1986)).

In this case, Wielepski has alleged that City of West Allis has a policy and custom of failing to adequately train its police officers in the lawful use of force up arrest (Complaint ¶ 32); and that Defendant Kuhnmuench' and Corwin acted pursuant to the policy and custom of the City of West Allis (Complaint ¶ 34). There is no evidence to support these claims.

Robert Fletcher is the Deputy Chief of Police for the City of West Allis, and has ben since December 31, 2011. He has been employed by the City of West Allis Police Department since September 2003. Prior to being employed by the City of West Allis Police Department he was an Assistant District Attorney for the Waukesha County District Attorney's Office. (DPFF 93) Because of his lengthy service with the City of West Allis Police Department, Deputy Chief Fletcher has personal knowledge of the policies of the Police Department now, and those in effect on July 23, 2011. (DPFF 94)

16

At no time did Deputy Chief Fletcher or anyone at the West Allis Police Department fail to properly train, supervise, discipline or control any City of West Allis police officers. (DPFF 95)

The City of West Allis does not maintain a de facto policy, practice, or custom of failing to train, supervise, discipline or control its on or off duty police officers. (DPFF 96)

Training of police officers in Wisconsin is governed by state law. Wisconsin has established the Law Enforcement Standards Board to prescribe minimum requirements for police officer training. The board has issued regulations governing police officer training standards in such areas as defense and arrest tactics, effecting an arrest, and use of force. (DPFF 98) Deputy Chief Fletcher is familiar with the training requirements for police officers in the State of Wisconsin. (DPFF 99)

Both City of West Allis Police Defendant Officer Steven Kuhnmuench and Sgt. Corwin have met or exceeded the minimum training requirements established by the State of Wisconsin to be certified as a police officer and has maintained his certifications throughout his employment with the City of West Allis. (DPFF 100-101)

Wielepski testified at his deposition taken in this matter in April 2018 that he has no personal knowledge regarding the City of West Allis Police Department's policies and procedures. (DPFF 102) Wielepski testified that he has no knowledge of what training Sgt. Corwin received throughout his career. (DPFF 103)

Because Wielepski has no evidence to support these claims, and because the Defendant officers have met or exceeded training requirements of the State of Wisconsin, Wielepski's Monell claim based on failure to adequately train must be dismissed. Further, there is no evidence that the City of West Allis has any policy or custom which resulted in violating Wielepski's constitutional rights.

17

**CONCLUSION**

There evidence in this case does not support any of Wielepski's claims against the Defendants. For the reasons stated herein, Wielepski's claims must be dismissed, with prejudice.

Dated at Wauwatosa, Wisconsin, this 16th day of May, 2018.

                                        GUNTA LAW OFFICES, S.C.
                                        Attorneys for Defendants

By:   /s/ Ann C. Wirth
        Gregg J. Gunta, WI Bar No. 1004322
        Ann C. Wirth, WI Bar No. 1002469
        John A. Wolfgang, WI Bar No. 1045325
        9898 W. Bluemound Road, Suite 2
        Wauwatosa, Wisconsin 53226
        T: (414) 291-7979 / F: (414) 291-7960
        Emails:    gjg@guntalaw.com
                          acw@guntalaw.com
                          jaw@guntalaw.com