IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

_____

DAVID P. WIELEPSKI,               *

         Plaintiff,          *

-vs-                      *      Case No. 17-CV-01004

CITY OF WEST ALLIS, WISCONSIN,   *
a municipal corporation; STEVEN R.
KUHNMUENCH, in his individual capacity;  *
CLINT CORWIN, in his individual capacity;
and UNKNOWN UNNAMED EMPLOYEES  *
OF THE CITY OF WEST ALLIS,
WISCONSIN, in their individual capacities,  *

         Defendants.       *

_____

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMRY JUDGEMENT**

_____


       Plaintiff David P. Wielepski alleges that defendants violated his right as guaranteed by

the Fourth and Fourteenth Amendments to the United States Constitution to be free from

unreasonable searches and seizures by using excessive and unreasonable force in effectuating his

arrest resulting from a traffic stop on July 23, 2011. Mr. Wielepski also alleges that defendants

removed $2,800.00 in cash from him during his arrest on July 23, 2011 and did not return it to

him in violation of his rights against deprivation of his property without due process as

guaranteed by the Fifth and Fourteenth Amendments.

       Defendants have filed for summary judgement on all of Mr. Wielepski's claims.

Defendants assert that defendants' use of force was reasonable under the circumstances; that the

individual officers are entitled to qualified immunity; that there is insufficient evidence to

support Mr. Wielepski's claim that defendants deprived him of $2,800.00 in cash; and that the evidence does not support Mr. Wielepski's contention that the City of West Allis failed to adequately train or supervise the defendant individual officers.

Mr. Wielepski acknowledges that, after thorough discovery into the matter, he does not have sufficient evidence to put in contest his claim that defendants deprived him of property without due process of law. Mr. Wielepski, therefore, voluntarily withdraws that claim. Plaintiff also voluntarily withdraws his claims for entity liability against the City of West Allis.

Defendants' motion for summary judgement must fail in all other respects. Mr. Wielepski has adduced sufficient evidence to put in contest the question of whether the force defendants used in making his arrest was excessive and unreasonable, and, whether the City of West Allis had a policy or custom of inadequate supervision and training regarding the use of force that caused the deprivation of Mr. Wielepski's rights.


## STATEMENT OF FACTS

In the early morning hours on July 23, 2011, plaintiff David P. Wielepski was a passenger in a vehicle operated by his friend, Isac A. Garcia. Mr. Wielepski and Mr. Garcia were returning from an evening celebrating Mr. Wielepski's birthday at the Oneida Casino. (PPFOF 1.)

Mr. Garcia's vehicle, with Mr. Wielepski in it, caught the attention of defendant Clint Corwin, who was on duty driving a squad car as a police sergeant with the City of West Allis Police Department. Sergeant Corwin began to pursue Mr. Garcia's vehicle. At some point during the pursuit Sgt. Corwin activated the red and blue emergency lights on top of his squad car. After continuing to drive for about a minute, Mr. Garcia eventually stopped his vehicle at the end

2

of a dead-end alley in the City of West Allis. Sergeant Corwin stopped his squad car immediately behind Mr. Garcia's vehicle, blocking any opportunity for Mr. Garcia to drive his vehicle out of the alley. (PPFOF 2; DPFOF 10-11, 18, 26, 28.)

Sergeant Corwin exited and came around the front of his squad car behind Mr. Garcia's vehicle with his gun drawn and pointed at Mr. Garcia's vehicle. Mr. Garcia attempted to get out of his vehicle on the driver's side, but got back in upon orders from Sergeant Corwin to stay in the vehicle. (DPFOF 29-30, 32.)

A short time afterward, Mr. Wielepski got out and stood up facing the rear of Mr. Garcia's vehicle on the passenger side. Mr. Wielepski had his hands up to signify he was unarmed and surrendering. (PPFOF 6.) Sergeant Corwin moved to the rear of Mr. Garcia's vehicle on the passenger side with his gun drawn and his arms extended in a shooting stance. (PPFOF 6.) Sergeant Corwin could tell that that Mr. Wielepski was quite intoxicated. (PPFOF 7.) Sergeant Corwin holstered his firearm and pulled out his electronic control device or "taser," aimed it at Mr. Wielepski, who was still standing with his hands up. (PPFOF 8.) Sergeant Corwin began shouting commands at Mr. Wielepski, first ordering him to get back in the car and then telling him to get down on the ground. (PPFOF 9-10.) The dashcam audio from Officer McNally's squad and the rear-seat-cam audio from Sergeant Corwin's squad captures Sergeant Corwin yelling commands at Mr. Wielepski. But, Mr. Wielepski cannot be heard yelling or saying anything in response. (PPFOF 11-12.)

When Mr. Wielepski did not comply with his orders, Sergeant Corwin grabbed Mr. Wielepski by the front of his shirt and yanked him forward. (PPFOF 13.) Off-balance, Mr. Wielepski awkwardly stumbled forward into Sergeant Corwin. (Id.) Just then, defendant Steven R. Kuhnmuench came up behind Sergeant Corwin. (PPFOF 14.) As Mr. Wielepski careened

3

toward him, Sergeant Corwin pivoted, stepped back and fired the taser at Mr. Wielepski, hitting him in the chest under his left arm. (PPFOF 15.) Mr. Wielepski, still stumbling forward, spun around, into Officer Kuhnmuench as Officer Kuhnmuench struck Mr. Wielepski with his flashlight. (PPFOF 16.) Sergeant Corwin then grabbed Mr. Wielepski with both hands and pulled him, face first, to the pavement. (PPFOF 17.) When Mr. Wielepski's face hit the pavement he received a gash above his right eye. (PPFOF 18.)

While Mr. Wielepski lay face-down on the pavement, Officer Kuhnmuench kicked him in the side. (PPFOF 19.) Officer Kuhnmuench and Sergeant Corwin pulled Mr. Wielepski's arms behind his back and handcuffed him. (PPFOF 20.) Sergeant Corwin and Officer Kuhnmuench kneeled on Mr. Wielepski for more than two minutes and held him face down on the pavement while he remained handcuffed from behind howling in pain. (PPFOF 21.) Mr. Wielepski howled in pain for an additional two minutes or more while officers held him face-down on the ground. (PPFOF 22.) When officers lifted Mr. Wielepski up off the pavement to place him on a gurney furnished by the EMS, service he was limp and unconscious. (PPFOF 23.)

The taser or Electronic Control Device (ECD) Sergeant Corwin used on Mr. Wielepski was the model Taser X26. (PPFOF 24.)

The criminal charges against Mr. Wielepski ultimately resulting from this incident were misdemeanors: Resisting or Obstructing an Officer, Wis. Stats., § 946.41(1); and Disorderly Conduct, Wis. Stats., § 946.41(1). (PPFOF 30.) The Resisting or Obstructing Charge was ultimately dismissed on the prosecutor's motion and Mr. Wielepski was convicted of Disorderly Conduct after he entered a plea of guilty. (PPFOF 31.)

While Sergeant Corwin considered that Mr. Wielepski might be engaging in misdemeanor disorderly conduct during the time he was standing next to the vehicle facing

Sergeant Corwin with his hands up refusing to comply with Sergeant Corwin's orders to get down on the ground, Sergeant Corwin did not consider that Mr. Wielepski had moved beyond the point of disorderly conduct to resisting and "almost assaulting an officer" until Mr. Wielepski stepped and reached out towards him after Sergeant Corwin had yanked on Mr. Wielepski's shirt. (PPFOF 32-33.)

Sergeant Corwin's dashcam video combined with the audio on his rear seat video in his squad and the audio on Officer McNally's dashcan video reveals that at no time did Mr. Wielepski offer resistance or engage combatively with anyone. (PPFOF 25.) At no time did Mr. Wielepski present a threat of injury or harm to anyone. (PPFOF 26.) The amount of force used against Mr. Wielepski by Officer Kuhnmuench and Sergeant Corwin was unreasonable and excessive under the circumstances. (PPFOF 27.) Neither Officer Kuhnmuench nor Sergeant Corwin attempted to dissuade or prevent the other from exerting unreasonable and excessive force against Mr. Wielepski.

Officer Kuhnmuench and Sergeant Corwin willfully, wantonly and recklessly exerted unreasonable and excessive force against Mr. Wielepski. (PPFOF 25-27.)

## ARGUMENT

Methodology on Motions for Summary Judgement

"Summary judgment is proper only if there is no genuine (in the sense of reasonably contestable) issue of material (that is, potentially outcome-determinative) fact. Fed. R. Civ. P. 56." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394 (7th Cir. 1997). On summary judgement, all statements of fact and inferences therefrom are to be considered in the light most favorable to the non-moving party. *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009); *Wolf v. Buss*

5

*America Inc.*, 77 F.3d 914, 918 (7th Cir. 1996). Credibility of witnesses can only be assessed at

trial. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Where a determination of the

credibility of witnesses is essential to resolving an issue of material fact, summary judgement is

properly denied. *Spreen v. Brey*, 961 F. 2d 109, 111 (7th Cir. 1992).

> "'Credibility determinations, the weighing of the evidence, and the
> drawing of legitimate inferences from the facts are jury functions,
> not those of a judge.' Liberty Lobby, supra, at 255. Thus, although
> the court should review the record as a whole, it must disregard all
> evidence favorable to the moving party that the jury is not required
> to believe. See Wright & Miller 299. That is, the court should give
> credence to the evidence favoring the nonmovant as well as that
> 'evidence supporting the moving party that is uncontradicted and
> unimpeached, at least to the extent that that evidence comes from
> disinterested witnesses.' Id. at 300."

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-151 (U.S. 2000).

Summary judgement must also be denied "where the evidence in support of the motion

does not establish the absence of a genuine issue of material fact, even if no evidence opposing

the motion has been presented." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d at 1396. [Emphasis

in original.] The inquiry is "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); see also *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Only when it is clear that no

reasonable fact finder could decide for the non-moving party, is summary judgment appropriate.

*McKenzie v. Illinois Dept. of Trans.*, 92 F.3d 473 (7th Cir. 1996); *Tobey v. Extel/JWP, Inc.*, 985

F.2d 330, 332 (7th Cir. 1993).

I.  THE EVIDENCE IS SUFFICIENT TO PUT IN CONTEST ALL ELEMENTS

OF MR. WIELEPSKI'S CLAIM THAT DEFENDANTS USED FORCE THAT WAS EXCESSIVE AND UNREASONABLE IN EFFECTUATING HIS ARREST.

Defendants have accurately summarized the law generally pertaining to analyzing a claim of an excessive and unreasonable use of force by police in effectuating a seizure under the Fourth Amendment. (D Brief, pp. 4-5.) As defendants point out, the reasonableness of any particular use of force depends on the balance between the nature and significance of the governmental intrusion on Mr. Wielepski's Fourth Amendment interests and the importance of the governmental interests alleged to justify the intrusion under the totality of the facts and circumstances known to the officer at the time the force is applied. *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013). In performing this balancing analysis, courts are advised to examine the officers' actions under the three-factor test laid out by the Supreme Court in *Graham v. Connor*, 490 U.S. 386, 396 (1989). This approach evaluates whether the quantum of force used is objectively reasonable in light of (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013); *Skube v. Williamson*, 2015 U.S. Dist. LEXIS 24362, 27, 2015 WL 890363.

Defendants argue that Sergeant Corwin's and Officer Kuhnmuench's use of force was objectively reasonable "given the apparent attempt by the vehicle driver to evade the officer, the location where the vehicle stopped, Wielepski's uncooperative and belligerent behavior, his size and apparent level of intoxication, and his movements toward the officers as they attempted to control him." (D Brief, p. 5.) Since Mr. Wielepski was not driving and had committed no crime as of the point where Sergeant Corwin tased him, defendants' argument bears primarily upon the

second and third factors: whether Mr. Wielepski posed an immediate threat to the safety of the officers, and whether he was actively resisting arrest.

Contrary to defendants' assertions, a reasonable jury viewing the evidence and construing it in the light most favorable to Mr. Wielepski would be warranted in concluding that tasing Mr. Wielepksi and kneeling on top of him for several minutes when he was handcuffed and face down on the pavement was objectively unreasonable because Mr. Wielepski did not pose an immediate threat to the officers and was not actively resisting arrest.

A. The nature and significance of the governmental intrusion on Mr. Wielepski's Fourth Amendment interests.

The nature and significance of the governmental intrusion on Mr. Wielepski's Fourth Amendment interests is represented by the quantum of force defendants used on Mr. Wielepski in seizing him. *Abbott v. Sangamon County*, 705 F.3d at 725. In *Abbott v. Sangamon County,* the Court of Appeals for the Seventh Circuit observed that the model X26 Taser, the same model Sergeant Corwin used to tase Mr. Wielepski, when used in dart mode,

> uses compressed nitrogen to propel two "probes" toward the target at somewhere between 160 and 180 feet per second. The probes are aluminum darts tipped with steel barbs and are connected to the device by insulated wires, which are about twenty-five feet in length. Once the probes strike the target, the officer pulls the trigger and the device delivers 50,000 volts of electric current, but the amount of voltage that enters the target's body is closer to 1200 volts. These high-voltage electric waves "overpower the normal electrical signals within the [target's] nerve fibers"; they "override the central nervous system[ ] and take[ ] direct control of the skeletal muscles." "The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's [**51] central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." Bryan v. MacPherson, 630 F.3d 805, 824 (9th Cir. 2010) (footnotes omitted) (same model); see also Draper v.

Case 2:17-cv-01004-LA   Filed 06/19/18   Page 8 of 23   Document 31

Reynolds, 369 F.3d 1270, 1273 n.3 (11th Cir. 2004) (similar description of the model M26 Taser).

*Id.* The Court went on to explain:

> This court has acknowledged that "one need not have personally endured a taser jolt to know the pain that must accompany it," *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009), and [**52] several of our sister circuits have likewise recognized the intense pain inflicted by a taser, *see, e.g., Bryan*, 630 F.3d at 824 ("The tasered person also experiences an excruciating pain that radiates throughout the body."); *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993) ("[A] stun gun inflicts a painful and frightening blow [that] temporarily paralyzes the large muscles of the body, rendering the victim helpless."); *Orem v. Rephann*, 523 F.3d 442, 448 (4th Cir. 2008) (same). Accordingly, we have held that, even though it is generally nonlethal, the use of a taser "is more than a *de minimis* application of force," *Lewis*, 581 F.3d at 475, but we have also acknowledged that the use of a taser, like the use of pepper spray or pain-compliance techniques, generally does not constitute as much force as so-called impact weapons, such as baton launchers and beanbag projectiles, *Phillips*, 678 F.3d at 521. The use of a taser, therefore, falls somewhere in the middle of the nonlethal-force spectrum. *See Bryan*, 630 F.3d at 826 (describing the X26 in dart mode as "an 'intermediate or medium, though not insignificant, quantum of force'" (citation omitted)). Indeed, the Sangamon County Taser Policies [**53] and Procedures and the Use of Force Scale place tasers at an intermediate level of force, on par with pepper spray…. That said, when used in dart mode, the X26 "intrudes upon the victim's physiological functions and physical integrity in a way that other non-lethal uses of force do not. While pepper spray causes an intense pain and acts upon the target's physiology, the effects of the X26 are not limited to the target's eyes or respiratory system." Bryan, 630 F.3d at 825; cf. Oliver v. Fiorino, 586 F.3d 898, 903-04 (11th Cir. 2009) (after being tased at least eight times over a two-minute period, decedent "died as a result of 'ventricular dysrhythmia in conjunction with Rhabdomyolisis' as a result of 'being struck by a Taser'").

*Id.* at 726.

Thus, the model X26 Taser "falls somewhere in the middle of the nonlethal-force spectrum.…'an intermediate or medium, though not insignificant, quantum of force.'" *Id.* at 726.

The Seventh Circuit Court of Appeals has deemed an officer's single application of the X26 Taser to a subject a "substantial intrusion on [the plaintiff's] Fourth Amendment interests."[1] *Id.* at 730.

### B. Application of the *Graham* factors

The Court must balance the nature and significance of the governmental intrusion on Mr. Wielepski's Fourth Amendment interests against the governmental interests asserted by the officers to justify the intrusion under the totality of the circumstances known to the officers at the time the force is applied. In doing so, the Court is directed to the three factors elucidated in *Graham v. Conner*: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. at 396; *Abbott v. Sangamon County*, 705 F.3d at 724; *Skube v. Williamson*, 2015 U.S. Dist. LEXIS 24362, 27, 2015 WL 890363.

Defendants sum up their analysis of this balance with regard to Sergeant Corwin's use of his taser on Mr. Wielepski as follows:

> Sgt. Corwin used his taser once, after Wielepski got out of the car defying Sgt. Corwin's commands, and refused to get to the ground and was moving toward the officers. Prior to the tasing, both Wielepski and the vehicle's driver ignored his commands to stay in the car. Wielepski is large, was drunk, and was repeatedly swearing at Sgt. Corwin. Given the circumstances, including the time of night, the close quarters of the parking lot, Wielepski's behavior and size, and his movement toward the officers in defiance of their orders to get to the ground, Sgt. Corwin's use of the taser was reasonable and not excessive.

---

[1] To be clear, though the Court was commenting on a single application of the taser, that application was the second of two applications. The first application was not at issue in the case. *Abbott v. Sangamon County*, 705 F.3d 706, 730 (7th Cir. 2013).

10

(D Brief, p. 11.) Defendants' argument essentially boils down to: Mr. Wielepski ignored and defied Sergeant Corwin's commands, he was big and drunk and swearing at Sergeant Corwin, Sergeant Corwin and Mr. Wielepski were in close quarters and Mr. Wielepski "moved toward" Sergeant Corwin. The factors articulated by defendants do not justify the deployment of an intermediate level of force, such as a taser. See, *Abbott v. Sangamon County*, 705 F.3d at 730, and, *Skube v. Williamson*, 2015 U.S. Dist. LEXIS 24362 *, 2015 WL 890363.

    1.  The nature of Mr. Wielepski's criminal offense, if any, was not serious or violent.

First, if Mr. Wielepski had committed a criminal offense as of the time Sergeant Corwin tased him, which Mr. Wielepski disputes, it was minor and nonviolent. The criminal charges against Mr. Wielepski ultimately resulting from this incident were misdemeanors: Resisting or Obstructing an Officer, Wis. Stats., § 946.41(1); and Disorderly Conduct, Wis. Stats., § 946.41(1), not serious or violent crimes.[2] See *Abbott v. Sangamon County*, 705 F.3d at 730 (stating that obstructing or resisting a police officer is "not a serious or violent crime"); *Skube v. Williamson*, 2015 U.S. Dist. LEXIS 24362 *, 2015 WL 890363.

Moreover, Mr. Wielepski was merely a passenger in the car driven by Isac Garcia. Whatever law violations may have warranted Sergeant Corwin's pursuit and stop of the vehicle, Mr. Wielepski had not committed them. Mr. Wielepski exited the vehicle and failed to return to it contrary to Sergeant Corwin's orders, but that is not a crime. Sergeant Corwin's dashcam video reveals Mr. Wielepski standing with his hands up in a pose communicating that he was unarmed and harmlessness. The audio from Officer McNally's dashcam and Sergeant Corwin's backseat cam captures Sergeant Corwin yelling at Mr. Wielepski first to get back in the vehicle

---

[2] The Resisting or Obstructing Charge was ultimately dismissed on the prosecutor's motion and Mr. Wielepski was convicted of Disorderly Conduct after he entered a plea of guilty.

and then to get face-down on the ground; but, it does not indicate that Mr. Wielepski was yelling back "Fuck you" (or anything else), as Sergeant Corwin claims. Sergeant Corwin's dashcam video confirms that, at no point prior to Sergeant Corwin grabbing him by the front of the shirt, was Mr. Wielepski physically resisting or obstructing Sergeant Corwin. The video shows that, by grabbing the inebriated Mr. Wielepski by the front of his shirt and pulling him forward in a confined space, it was Sergeant Corwin who caused Mr. Wielepski to stumble forward and move involuntarily toward Sergeant Corwin. It was then that Sergeant Corwin deployed his taser, causing the probes to launch and embed themselves in Mr. Wielepski's chest, just below his left armpit. Up until that point, Mr. Wielepski had broken no law and committed no crime.

Defendants describe Mr. Wielepski's stumbling toward Sergeant Corwin in response to Sergeant Corwin having grabbed Mr. Wielepski's shirt and pulling him forward as a movement by Mr. Wielepski toward Sergeant Corwin and Officer Kuhnmuench "in defiance of their orders to get to the ground." (D Brief p. 11.) But, a reasonable jury could easily conclude, as seems obvious from Sergeant Corwin's dashcam video, that Mr. Wielepski's movement toward the officers was the completely involuntary response of an inebriated Mr. Wielepski to having been grabbed by the shirt and yanked forward by Sergeant Corwin. See, *Skube v. Williamson*, 2015 U.S. Dist. LEXIS 24362 , 28, 2015 WL 890363, citing, *Scott v. Harris*, 550 U.S. 372, 381 (2007) (The Court notes that, to the extent that Deputy Koester's testimony about Skube constituting a threat conflicts with what is depicted in the video, the Court is permitted to "view[] the facts in the light depicted by the videotape."). A jury could easily conclude that in stumbling toward Sergeant Corwin in that manner, Mr. Wielepski had committed no crime.


2.  Wielepski posed no mmediate threat to safety of the officers or others.

Second, Mr. Wielepski did not pose an immediate threat to the safety of Sergeant Corwin or Officer Kuhnmuench. Sergeant Corwin's dashcam video shows that as Mr. Wielepski involuntarily stumbled forward in response to being yanked by the shirt by Sergeant Corwin, and just after being tased by Sergeant Corwin, he collided with Sergeant Corwin. Mr. Wielepski put is left arm up to cushion his impact with Sergeant Corwin and it made contact with Sergeant Corwin's shoulder, but the video cannot be interpreted to indicate that Mr. Wielepski grabbed Sergeant Corwin in any sort of aggressive or assaultive fashion. There is no indication that Mr. Wielepski attempted to grab Sergeant Corwin's taser or service revolver.

The video shows that at that point Sergeant Corwin simultaneously pivoted backward and to the side and Mr. Wielepski spun around and careened involuntarily into Officer Kuhnmuench. Officer Kuhnmuench stepped back and simultaneously delivered a blow to Mr. Wielepski with his flashlight. A reasonable jury could certainly conclude that Mr. Wielepski's movement toward and contact with Officer Kuhnmuench was not voluntary. The video shows that Mr. Wielepski did not grab or make contact with Mr. Kuhnmuench is an aggressive or assaultive manner. He did not attempt to grab Officer Kuhnmuench's flashlight or his service revolver.

Sergeant Corwin's dashcam video shows that after Mr. Wielepski careened off of Sergeant Corwin into Officer Kuhnmuench, Sergeant Corwin grabbed Mr. Wielepski by the shoulders, spun him around and, as Mr. Wielepski's trousers began to fall off, threw him face-first to the ground. Officer Kunmuench and Sergeant Corwin then jumped with their knees on Mr. Wielepski's back and shoulders. Officer Kuhnmuench can be seen on Sergeant Corwin's dashcam video forcefully kneeing Mr. Wielepski in the side as he pulls Mr. Wielepski's left arm up to handcuff Mr. Wielepski's wrists behind his back.

A reasonable jury viewing the dashcam video in the light most favorable to Mr. Wielepsky could easily conclude that, under the totality of the circumstances, at no point in the sequence of events from the time Sergeant Corwin grabbed and yanked Mr. Wielepski forward by the shirt until the officers had handcuffed Mr. Wielepski while he was face down on the ground, did Mr. Wielepski pose an immediate threat to the safety of Sergeant Corwin or Officer Kuhnmuench. See, *Skube v. Williamson*, 2015 U.S. Dist. LEXIS 24362 , 28, 2015 WL 890363 (The Court notes that, to the extent that Deputy Koester's testimony about Skube constituting a threat conflicts with what is depicted in the video, the Court is permitted to "view[] the facts in the light depicted by the videotape." See, *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

3.   Mr. Wielepski did not actively resist or attempt to evade the officers by flight.

Third, in light of the analysis presented above, a reasonable jury viewing the evidence in the light most favorable to Mr. Wielepsky could easily conclude that, under the totality of the circumstances, at no point in the sequence of events from the time Sergeant Corwin grabbed and yanked Mr. Wielepski forward by the shirt until the officers had handcuffed Mr. Wielepski while he was face down on the ground, did Mr. Wielepski actively resist arrest or attempt to evade arrest by flight.

Under the *Graham v. Connor* objective reasonableness standard as operationalized by the three-factor test in *Graham*, a reasonable jury could easily conclude from watching the dashcam footage that the force used by Sergeant Corwin and Officer Kuhnmuench in tasing Mr. Wielepski, striking him with a flashlight, throwing him face-first to the ground so that his face struck the pavement and jumping on his back and shoulders with their knees was unreasonable and unprovoked under the totality of the circumstances.

14

The three Seventh Circuit Court of Appeals cases addressing police deployment of a taser cited by defendants in their brief do not indicate to the contrary. (D Brief, pp. 10-11) As described by defendants, those cases, *Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011); *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011) and *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th Cir. 2010), all require the tased suspect to have been actively resisting or physically interfering with officers under circumstances creating the likelihood of imminent physical harm to officers or others for the tasing to have been reasonable under the Fourth Amendment. In *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012), the court explained, "[W]illful noncompliance [with police orders] is not the same as 'actively resisting' but instead a passive 'resistance requiring the minimal use of force.' [*Smith v. Ball State University Board of Trustees*,] 295 F.3d [763] at 771 [(7th Cir. 2002)] (emphasis added); see also *Cyrus* [*v. Town of Mukwonago*,] 624 F.3d [856,] at 863 [(7th Cir. 2010)] (no evidence suggesting that the plaintiff 'violently resisted' officers even if plaintiff refused to release arms for handcuffing)."

It is clear that Mr. Wielepski engaged in only passive resistance to Sergeant Corwin and Officer Kuhnmuench, up until the point where Sergeant Corwin grabbed Mr. Wielepski's shirt and pulled him forward. Sergeant Corwin and Officer Kuhnmuench argue that at that point Mr. Wielepski intentionally moved toward them in a way that constituted active resistance and created a substantial risk of imminent harm. A reasonable jury, viewing Sergeant Corwin's dashcam could conclude that a reasonable officer in Sergeant Corwin's and Officer Kuhnmuench's place would have recognized that Mr. Wielepski's movement toward the officers was a non-threatening and involuntary product of his inebriation and being yanked off balance by Sergeant Corwin. See, *Cyrus v. Town of Mukwanago*, 624 F.3d 856 at 862-63 (7th Cir. 2009) (jury reasonably could find the use of taser to be excessive: Cyrus's disobedience of officer's

commands could be interpreted in several ways—e.g., a jury could conclude that his barrel roll down the driveway was an involuntary response to being tased twice; Cyrus had committed at most a misdemeanor under Wisconsin law; and there was absolutely no evidence that Cyrus had violently resisted the officer's attempts to handcuff him).

A reasonable jury could conclude that Mr. Wielepski had not engaged in active resistance or physical interference or created an imminent threat sufficient to justify Sergeant Corwin's tasing of him.

## II.    DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity is available to individual government employees only. Municipalities such as the City of West Allis enjoy no qualified immunity from liability for their deprivations of constitutional rights under 42 U.S.C. §1983. *Owen v. City of Independence*, 445 U.S. 622, 650 (1980). Thus, Sergeant Corwin and Officer Kuhnmuench are the only defendants in this case who is eligible to assert the affirmative defense of qualified immunity.

To be entitled to qualified immunity from liability under §1983, defendants must show that their acts were discretionary, reasonably within the scope of their employment and "objectively reasonable." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (Qualified immunity is an affirmative defense that must be pleaded by the defendant). The standard is an objective one, a defendant's subjective knowledge or belief is not relevant. *Harlow v. Fitzgerald*, 457 U.S. at 815-9; *Davis v. Scherer*, 468 U.S. 183, 191 (1984), reh. den., 468 U.S. 1226. A defendant's actions are "objectively reasonable," even if they violated plaintiff's constitutional rights, so long as the rights violated were not "clearly established statutory or constitutional rights of which a reasonable person would have known."

16

*Id.* A reasonable person is deemed, as a matter of law, to have known all laws and statutes that were clearly established at the time the acts were committed. *Harlow v. Fitzgerald*, 457 U.S. at 818-9. However, whether a particular constitutional or statutory right was clearly established at the time of defendants' actions in this case must be determined with regard to the specific circumstances of this case. *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987).

Qualified immunity applies unless the contours of the constitutional right allegedly violated are "sufficiently clear that a reasonable official would understand that what he is doing violates that right. [But, t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful...." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Importantly, though the right must be clearly established in a particularized sense rather than in an abstract or general sense, a case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Abbott v. Sangamon County*, 705 F.3d at 731.

In *Abbott v. Sangamon County*, 705 F.3d at 731, the court teaches:

> To determine whether a right is clearly established we look to controlling precedent from both the Supreme Court and this circuit, and if there is no such precedent we cast a wider net and examine all relevant case law to determine whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time. *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (officers were entitled to rely on cases from other circuits even though their own circuit had not yet addressed the issue). [Quotation marks and other cites omitted.]

Defendants rely upon the decision of the Seventh Circuit Court of Appeals in *Abbott v. Sangamon County*, 705 F.3d 706 (7th Cir. 2013), to support their assertion that they are entitled

17

to qualified immunity. However, in doing so, they focus exclusively on the portion of the court's opinion dealing with the claims of only one of the two plaintiffs, those of Travis Abbott, the plaintiff whose fact situation is least similar to the facts in this case. (D Brief, pp. 13-14.) Defendants' own brief acknowledges that the "facts of the [*Abbott*] case are not directly parallel to this case." (Id.) However, defendants ignore the court's opinion and holding regarding the other plaintiff, Cindy Abbott, whose excessive force claim parallels Mr. Wielepski's much more closely.

First of all, the quantum of force used by police in Travis Abbott's case was less than in Cindy Abbott's case and in Mr. Wielepski's case. The police officer who tased Travis Abbott did so in "drivestun" mode, a use of the taser that is qualitatively less intrusive to the suspect than the "dart mode" used on Cindy Abbott and on Mr. Wielepski. *Abbott v. Sangamon County*, 705 F.3d at 725-6. The court observed that in dart mode, the "impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." *Id*. [Internal quotation marks omitted.] However, in "drivestun" mode, "the officer does not fire probes at the target but instead presses the device's electrodes directly to the target's body and pulls the trigger to deliver the electric current. When utilized in this manner, the X26 does not override the target's central nervous system. Rather, it becomes a pain compliance tool with limited threat reduction." *Id*. [Internal quotation marks omitted.] As with Mr. Wielepski, in *Abbott*, the officer tased Cindy Abbott in dart mode. *Id*.

But, more importantly, as the excerpt from the *Abbott* opinion quoted by defendants clearly indicates, the court found that, unlike Cindy and Mr. Wielepski, Travis Abbott was actively and physically resisting Officer Sweeney. He continued to fight and physically resist

Officer Sweeney throughout the period of time Sweeney was tasing him. *Id.* at 728. The court noted, "Indeed, it is undisputed that Sweeney used the taser until Travis stopped fighting but did not use it thereafter, suggesting that Sweeney used no more force than was necessary to gain control of the actively resisting Travis." *Id.* Thus, the court observed, "Insofar as Travis continued to resist after the first tasing, Deputy Sweeney did not violate clearly established law by using the taser in drivestun mode several more times until Travis was subdued." *Id.*

With regard to Cindy Abbott's excessive force claim, the court came to a different conclusion and reversed the district court's grant of summary judgement in favor of Officer Sweeney. The Court first addressed the seriousness of Cindy's offense. The court acknowledged that, while doubtful, Officer "Sweeney had arguable probable cause to believe that Cindy had obstructed a peace officer," which, in Illinois, was a Class A misdemeanor and "not a serious or violent crime." *Id.* at 730. Cindy's offense was the same as that for which Mr. Wielepski was just as dubiously charged.

As for the second factor of the *Graham* three-part test, the court found that, though Cindy did not comply with Officer Sweeney's commands, she did not physically assault or fight with Officer Sweeney. *Id.* at 729. The court found Cindy did not actively resist Officer Sweeney. *Id.* As discussed earlier, a jury would be warranted in finding the same for Mr. Wielepski.

On the third *Graham* factor, the court found "absolutely no evidence that Cindy posed a threat to Sweeney, herself, or anyone else." *Id.* The court noted that, although Cindy did not comply with Sweeney's order to turn over onto her stomach, neither did she move. Thus, the court concluded, Cindy, at most, exhibited passive noncompliance and not active resistance." *Id.* As argued above, Sergeant Corwin's dashcam video would entitled a jury to conclude the same

Case 2:17-cv-01004-LA   Filed 06/19/18   Page 19 of 23   Document 31

regarding Mr. Wielepski. Mr. Wielepski did not move until Sergeant Corwin yanked his shirt causing him to involuntarily move toward Sergeant Corwin and Officer Kuhnmuench.

The court concluded,

> Indeed, courts generally hold that it is unreasonable for officers to deploy a taser against a misdemeanant who is not actively resisting arrest. See Cyrus [v. Town of Mukwanago], 624 F.3d [856] at 862-63 [(7th Cir. 2009)] (jury reasonably could find the use of taser to be excessive: Cyrus's disobedience of officer's commands could be interpreted in several ways—e.g., a jury could conclude that his barrel roll down the driveway was an involuntary response to being tased twice; Cyrus had committed at most a misdemeanor under Wisconsin law; and there was absolutely no evidence that Cyrus had violently resisted the officer's attempts to handcuff him).

*Id*. Since Mr. Wielepski was not actively resisting Sergeant Corwin and Officer Kuhnmuench, and, since a jury could conclude that Mr. Wielepski's movement toward Sergeant Corwin and Officer Kuhmuench was an involuntary response to having Sergeant Corwin yank him forward by the shirt while in an inebriated condition, the conclusion in this case must be the same: Courts would generally hold that it was unreasonable for the officers in this case to deploy a taser against Mr. Wielepski, a misdemeanant who was not actively resisting arrest. *Cyrus v. Town of Mukwanago*, 624 F.3d 856 at 862-63 (7th Cir. 2009).

And, while *Abbott* was decided in January, 2013, this was true of the general holding of courts in July of 2011, when Sergeant Corwin tased Mr. Wielepski. *Abbott v. Sangamon County*, 705 F.3d at 732. The court in *Abbott* stated that, "Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects …. Rather, only a minimal amount of force may be used on such arrestees." *Id*. [Citations omitted.] As previously noted, the *Abbott* court determined that the use of a taser "falls somewhere in the middle of the nonlethal-force spectrum." *Id*. at 726. Later in its opinion the court specifically observed with regard to tasers, "Additionally, since 2007, many of our sister

20

circuits have found the use of a taser against nonviolent, nonresisting misdemeanants to violate clearly established law, the absence of taser case law notwithstanding." *Id*. at 734 (citing cases from 2008, 2009 and 2011).

In Seventh Circuit Court of Appeals in 2009 in *Cyrus v. Town of Mukwanago*, 624 F.3d 856 at 862-63 (7th Cir. 2009), established:

> The evidence is also conflicting on the extent to which Cyrus resisted arrest. See Graham, 490 U.S. at 396 (considering whether the defendant evaded arrest by flight). To be sure, there is evidence that Cyrus did not obey Czarnecki's commands. But his behavior is susceptible of different interpretations. The parties dispute whether Cyrus ran or merely walked toward the house after Czarnecki told him he was on the wrong property. And although Czarnecki characterizes Cyrus's barrel-roll down the driveway as an attempt to flee, a jury might see it differently. That is, the jury might reasonably conclude that the barrel-roll was an involuntary reaction to the second Taser shock.

> Summary judgment was also inappropriate because a jury could conclude that Czarnecki's use of force [in tasing Cyrus] was excessive in light of the other Graham factors. Cyrus had, at most, committed a misdemeanor offense under Wisconsin law, and he was not exhibiting violent behavior, see Casey v. City of Federal Heights, 509 F.3d 1278, 1281 (10th Cir. 2007) (noting that a lesser degree of force is reasonable when the offense of arrest is not committed violently). As importantly, there is no evidence suggesting that Cyrus violently resisted the officers' attempts to handcuff him. Although he refused to release his arms for handcuffing (or perhaps he could not because of the influence of the Taser shock), Czarnecki knew that Cyrus was unarmed and there was little risk Cyrus could access a weapon while face down at the foot of the driveway, with his hands underneath him and having already been shocked twice with the Taser.

In *Skube v. Williamson*, 2015 U.S. Dist. LEXIS 24362, 34-5, 2015 WL 890363, the District Court for the Central District of Illinois specifically addressed the taser cases cited by defendants in their brief, *Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011); *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011); and *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th

Cir. 2010) – which were decided September 23, 2011; May 5, 2011; and, in 2010, respectively --
and concluded, contrary to defendants' argument in this case, that those cases were actually
sufficient to objectively put a reasonable officer on notice that the "law was clear at the time that
Deputy Koester tased Skube [July 21, 2011 – two days before Sergeant Corwin tased Mr.
Wielepski] that Skube's actions did not amount to active resistance and that the use of a taser in
dart mode against a nonviolent, minor offender was unreasonable." In *Skube*, similar to Mr.
Wielepski, the plaintiff had engaged in a short period of strenuously arguing and not complying
with police orders, while moving about and posturing in an agitated manner that the police
officer interpreted as threatening, but had not physically resisted Officer Koester before being
tased. *Id*. at 23. In this case, Mr, Wielepski had refused Sergeant Corwin's orders for only about
a minute, before Sergeant Corwin grabbed his shirt, pulled him forward and tased him.

The *Skube* court stated that the three cases cited by defendants in this case, along with
others,

> negate the Defendants' assertion that '[t]here is no closely analogous
> case law that would put Deputy Koester on notice that Plaintiff's
> actions were passive and that use of a Taser was unreasonable.' The
> law was clear at the time that Deputy Koester tased Skube [July 21,
> 2011] that Skube's actions did not amount to active resistance and
> that the use of a taser in dart mode against a nonviolent, minor
> offender was unreasonable. Deputy Koester is therefore not entitled
> to summary judgment or a finding of qualified immunity against
> Skube's excessive force claim.

*Id*. at 35.

The Court should find no differently in this case. Defendants are not entitled to qualified
immunity because the law was clear as of July 23, 2011, that the use of a taser on a
misdemeanant who was not physically resisting or creating an imminent threat to officers or
others was objectively unreasonable.

22

**CONCLUSION**

For the reasons stated above, defendants' motion for summary judgement as to plaintiff's excessive force claims and as to qualified immunity, should be denied.

Dated this 18th day of June, 2018.

A. STEVEN PORTER AND KASIETA LEGAL GROUP, LLC, BY ROBERT J. KASIETA

By: ___/s/ A. Steven Porter_____
            A. Steven Porter
            State Bar No. 01000195
            Attorneys for Plaintiff
            David P. Wielepski

P.O. Box 7093
Madison, Wisconsin 53707
(608) 662-2285
(608) 819-6466 (fax)
asp@mailbag.com

559 D'Onofrio Drive, Suite 222
Madison, Wisconsin 53719
(608) 662-9999
(608) 662-9977 (fax)